## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert E. Markle,                  :
              Appellant          :
                                   :
                                   :
       v.                         :
                                   :
Commonwealth of Pennsylvania,      :
Department of Transportation,      :   No. 986 C.D. 2023
Bureau of Driver Licensing         :   Submitted: October 8, 2024


BEFORE:   HONORABLE ANNE E. COVEY, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE STACY WALLACE, Judge


OPINION BY
JUDGE COVEY                        FILED: December 19, 2024


        Robert E. Markle (Licensee) appeals from the Chester County Common Pleas Court's (trial court) August 24, 2023 order denying/dismissing his appeal and reinstating Licensee's 18-month suspension of his operating privilege. Licensee presents two issues for this Court's review: (1) whether the trial court erred and/or abused its discretion by concluding that he had been placed under arrest before refusing to submit to a chemical test; and (2) whether North Coventry Township, Chester County Police Officer Andrew Thiel's (Officer Thiel) extraterritorial conduct in Reading, Berks County, including his investigation and attempt to collect evidence from Licensee, was illegal under the Intergovernmental Cooperation Act (ICA)[1] and the Municipal Police Jurisdiction Act (MPJA).[2] After review, this Court affirms.

---

[1] 53 Pa.C.S. §§ 2301-2317.
[2] 42 Pa.C.S. §§ 8951-8955.

On August 24, 2022, at approximately 6:15 p.m., North Coventry Police Department officers were dispatched to a single-vehicle crash on the ramp from South Hanover Street to 422 Eastbound. *See* Reproduced Record (R.R.) at 14a. This location is situated in North Coventry Township, Chester County. *See id.* Upon arrival at this location, Officer Victoria Hipple (Officer Hipple) observed a white Ford F-250 off the side of the road down an embankment, trapped in between trees and brush. *See* R.R. at 14a. The vehicle was disabled. *See* R.R. at 15a. Officer Hipple observed the driver, Licensee, attempt to reverse the vehicle back onto the main road. *See* R.R. at 14a-15a. Officer Hipple further noted that the taillights were active, the reverse lights were on, and the vehicle's engine was revving. *See id.* Officer Hipple ordered Licensee to shift the vehicle into park, but Licensee continued to attempt to reverse the vehicle back onto the road and then shifted the vehicle to the drive position. *See* R.R. at 15a. At this point, Officer Hipple again instructed Licensee to place the vehicle in park and Officer Hipple believed Licensee complied. *See id.*

After making contact with Licensee, Officer Hipple noticed that the vehicle was still in the reverse position. *See* R.R. at 15a-16a. Officer Hipple also detected that Licensee's responses were delayed. *See* R.R. at 16a. When Officer Hipple asked Licensee to again place the vehicle in park, he instead shifted the vehicle to drive and sat there scrolling through his phone. *See id.* After instructing Licensee to again shift the vehicle into park, Licensee stated that the vehicle was already in the park position, but he eventually shifted it into park and continued to scroll on his phone. *See id.* Licensee stated to Officer Hipple that he was not hurt, and that he was calling his friend to pull him out of the trees. *See id.* Licensee also

2

declared that his steering was broke and that he was coming from an Alcoholics Anonymous (AA) meeting. *See id*. He further related that he could provide phone numbers from retired police officers and a judge. *See id*. Licensee tried to give Officer Hipple phone numbers and tried to make her call people while he was still seated in the vehicle because he could not get out of the car due to the door being pinned by the brush. *See id*.

While at the crash scene, Officer Hipple asked Licensee if he had anything to drink, to which he stated that he had not. *See id*. Officer Hipple did not believe him. *See* R.R. at 17a. During her initial interaction with Licensee, Officer Hipple observed that his eyes were bloodshot and glassy. *See id*. Officer Hipple also noted that Licensee's speech was slightly slurred. *See id*. Eventually, an ambulance arrived at the scene. *See id*. While Licensee was talking with the emergency medical personnel, he admitted to drinking at least one beer. *See id*. Officer Hipple assisted the on-scene medical personnel in escorting Licensee to the ambulance. *See* R.R. at 18a. She witnessed that Licensee was very unsteady on his feet to the point where they had to basically hold him up and direct him where to go. *See id*. Furthermore, the terrain was not impassable and was walkable for a normal person. *See id*. However, as Licensee and a medic arrived at the ambulance, Licensee stumbled up the stairs leading into the ambulance and then again when getting into the ambulance. *See id*. Licensee ultimately fell over onto the stretcher in the ambulance.

In the ambulance, Officer Hipple continued evaluating Licensee and talking with him. *See id*. During this conversation, Officer Hipple detected a moderate odor of alcoholic beverages emanating from Licensee while speaking with

3

him. *See id.* Moreover, Licensee's emotions were both high and low: he would cry and say that he had quit drinking, and he had gone to AA. *See id.* And then when the medical personnel asked him a question, he would stop crying and answer the question and then go back to crying again and saying that he quit drinking, and he did not need this right now. *See id.*

Licensee became agitated when the medics informed him that he would not be released but would instead be taken to the hospital. *See id.* He stated that he did not want to go to the hospital and continued to refer to his deceased son, stating that Officer Hipple had been there when they found him dead, and he kept repeating himself over and over.[3] *See* R.R. at 19a. In addition, Licensee asked Officer Hipple for favors saying things like - hey, just do me this favor. *See id.* While in the ambulance, Licensee was very delayed in answering questions and was acting abnormal by referring to things that were not talked about. *See id.* Officer Hipple did not perform any field sobriety tests on Licensee. *See* R.R. at 25a. However, Officer Hipple did tell Licensee he would have to submit to field sobriety tests if he did not go to the hospital. *See id.* Licensee asked Officer Hipple for advice about whether he should stay and do the sobriety tests or go to the hospital. *See id.* Officer Hipple explained that she could not give him advice. *See id.* Licensee never responded to Officer Hipple's question concerning submitting to field sobriety tests. *See id.* Ultimately, the emergency medical personnel determined that Licensee was not medically cleared to refuse treatment, so he had to go to the hospital. *See* R.R. at 19a.

---

[3] Officer Hipple testified that she was not present when they found Licensee's deceased son. *See* R.R. at 19a.

4

Thereafter, Licensee was transported to West Reading Hospital, which is located in Reading, Berks County. *See id.* Although Officer Hipple believed that Licensee was under the influence of alcohol and/or a controlled substance to the point where he was unfit to drive, she was at the end of her shift. *See* R.R. at 20a. Accordingly, Officer Hipple requested that the oncoming officer follow the ambulance to West Reading Hospital to perform a chemical test on Licensee. *See id.* The oncoming officer was Officer Thiel, who followed the ambulance to West Reading Hospital. *See id.* While at the hospital, Officer Thiel read the DL-26 Form[4] verbatim, in its entirety, to Licensee while he was sitting in a hospital bed. *See* R.R. at 35a, 38a. Licensee refused to consent to the blood draw. *See* R.R. at 38a. Licensee signed the DL-26 Form, refusing the chemical test. *See* R.R. at 39a.

On January 10, 2023, the Commonwealth of Pennsylvania (Commonwealth), Department of Transportation, Bureau of Driver Licensing (DOT) sent Licensee an Official Notice of Suspension of his driver's license for 18 months, effective February 14, 2023 (Notice). On January 13, 2023, Licensee appealed from the Notice to the trial court. By January 13, 2023 order, the trial court scheduled a hearing and stated that the appeal acted as a supersedeas. After several continuances, on August 24, 2023, the trial court held a hearing and denied/dismissed Licensee's appeal and reinstated his license suspension. Licensee

---

[4] The Pennsylvania Department of Transportation promulgated the DL-26 Form, which sets forth the prescribed language of the warning to be given to motorists arrested for driving under the influence of alcohol (DUI) about the penalties for refusing chemical tests. Police use the DL-26 Form to comply with the requirements of Section 1547(b) of the Vehicle Code, 75 Pa.C.S. § 1547(b), during DUI arrests. Section 1547(b) of the Vehicle Code is commonly known as the Implied Consent Law.

5

appealed to this Court.[5]  On August 31, 2023, the trial court directed Licensee to file a Concise Statement of Errors Complained of on Appeal pursuant to Pennsylvania Rule of Appellate Procedure (Rule) 1925(b) (Rule 1925(b) Statement).  On September 19, 2023, Licensee filed his Rule 1925(b) Statement.  On November 21, 2023, the trial court filed its opinion pursuant to Rule 1925(a).

Licensee first argues that the trial court erred and/or abused its discretion by concluding that he had been placed under arrest before refusing to submit to a chemical test given the fact that he was free to leave and never placed under arrest at the time the chemical test was requested.

Initially,

> [this Court] will only sustain a suspension of a licensee's operating privilege under the Implied Consent Law if DOT establishes that[:] (1) **the driver was arrested for driving under the influence** [(DUI)] by a police officer with reasonable grounds to believe the licensee was operating a vehicle while under the influence of alcohol or a controlled substance; (2) the driver was asked to submit to a chemical test; (3) the driver refused to take the chemical test; and (4) the driver was specifically warned that refusing the test would result in the revocation of his or her driver's license.

*Cornish v. Dep't of Transp.*, *Bureau of Driver Licensing*, 323 A.3d 114, 118-119 (Pa. Cmwlth. 2024) (emphasis added).

In *Maletic v. Department of Transportation, Bureau of Driver Licensing*, 819 A.2d 640 (Pa. Cmwlth. 2003), a police officer (officer) was

---

[5] In reviewing a driver's license suspension appeal, this Court's "review is limited to determining whether [the trial court] committed an error of law, whether [the trial court] abused its discretion, or whether the findings of fact are supported by substantial evidence."  *Garlick v. Dep't of Transp., Bureau of Driver Licensing*, 176 A.3d 1030, 1035 n.6 (Pa. Cmwlth. 2018).

6

dispatched to the site of a single-vehicle accident where he observed the licensee's vehicle on its side with her trapped inside. When the officer offered help, the licensee responded that she was all right and that he should not call the police. An emergency medical service team extracted the licensee from the vehicle and transported her to the hospital. Prior to the licensee going to the hospital, however, the officer questioned her about the accident. She stated that she did not know how the accident occurred, but she did admit to drinking prior to the event. The officer detected a strong alcohol odor on the licensee's breath, noted that she slurred her words, that there was a case of beer in the licensee's vehicle, and that the licensee had a lump on her head.

After the officer spent one-half hour at the accident scene investigating, he went to the hospital where he found the licensee in the emergency room on a gurney. Medical personnel were treating her when he arrived, and he noticed that they were extracting blood from her for medical purposes. The officer told her, while she was lying on the gurney, that she was under investigation for driving under the influence of alcohol. He then read to her the DL-26 Form, which includes the statement: "*You are now under arrest for driving under the influence of alcohol or a controlled substance pursuant to Section 3731 of the Vehicle Code*." R.R. at 74a (emphasis added). After reading the DL-26 Form to the licensee, the officer requested several times that she consent to having blood drawn for *legal* as well as medical purposes. The licensee refused, even after being warned, once again. The officer then left the emergency room, deeming the licensee's action a refusal to consent to a blood test.

7

The lower court sustained the licensee's driver's license suspension appeal determining that the only evidence suggesting that an arrest had occurred came from the officer's reading of the DL-26 Form to the licensee. The officer's testimony, however, indicated that he made no arrest before the licensee's refusal to submit to the blood test, that he never made mention of a future arrest, and that the licensee was in no way confined or restrained so that she could not come or go at her leisure. The lower court determined that a statement read on a form by the officer did not vitiate the balance of his testimony establishing that an arrest did not occur. The lower court, therefore, found that the licensee was not under arrest prior to her refusal to submit to a blood test. This Court reversed the lower court's order reasoning that "it is clear from the record that [the l]icensee was not going to be leaving the hospital anytime soon because she was undergoing emergency medical treatment. [This Court], therefore, conclude[d] that . . . the totality of the circumstances indicate[d] that there was an arrest." *Maletic*, 819 A.2d at 644 (citation omitted); *see also Dep't of Transp., Bureau of Traffic Safety v. Uebelacker*, 511 A.2d 929 (Pa. Cmwlth. 1986); *Dep't of Transp., Bureau of Driver Licensing v. Shine*, 539 A.2d 42 (Pa. Cmwlth. 1988); *Dep't of Transp., Bureau of Driver Licensing v. Jones*, 547 A.2d 877 (Pa. Cmwlth. 1988).

Here, Officer Hipple testified:

Q. Do you know how [Licensee] left the hospital?

A. I don't.

Q. Did you make any -- give any direction to Officer Thiel or any other officer that once he was discharged[,] he should be taken into custody?

A. The process for DUI charging is very different. It's a misdemeanor offense, so **he was there on medical reasons**, **which is why we responded to the hospital to request the legal blood draw there**. Otherwise, **he would have been detained at the scene**.

Q. Okay. He was not detained after his release from the hospital; is that correct?

A. There was no reason for that to happen.

R.R. at 30a (emphasis added).

Further, Officer Thiel related:

Q. So you stated that you read [the DL-26 Form] to [Licensee] verbatim?

A. I did.

Q. Let me ask you a question. Right below that black box there, do you see those four numbered points?

A. Yes.

Q. What is the first one?

A. **It says you are under arrest for driving under the influence of alcohol or a controlled substance** in violation of Section [3]802 of the Vehicle Code.

Q. **Was that read to** [**Licensee**]?

A. **It was**.

Q. Okay. Let me ask, **at that point would** [**Licensee**] **have been free to leave**?

A. **No**.

Q. Okay. Why is that?

A. **Because he's subject to an investigation**.

9

Q.  Okay.  How did [Licensee] respond to the reading of [DL-26 Form]?

A.  He kept telling me that --- dropping [police] officers' names and telling me I needed to talk to them.

R.R. at 38a (emphasis added).

Similar to *Maletic*, Licensee was involved in a single-vehicle car crash. Officer Hipple spent time at the accident scene investigating.  Licensee admitted to the medics that he had at least one beer, Officer Hipple detected a moderate alcohol odor on Licensee's breath, and noted that he slurred his words and had bloodshot and glassy eyes.  In addition, the terrain was not impassable and was walkable for a normal person, yet Officer Hipple witnessed that Licensee was very unsteady on his feet to the point where she and the medic had to basically hold Licensee up and direct him where to go.  Licensee had trouble walking to the ambulance, stumbled up the steps leading into the ambulance, stumbled when getting into the ambulance, and fell onto the stretcher in the ambulance.  Licensee's emotions were high and low as he continued to ramble and talk about matters not discussed.  He asked Officer Hipple and Officer Thiel for favors and to call police officers and a judge for him.  Further, here, unlike in *Maletic*, Officer Hipple advised Licensee that if he did not go to the hospital, he would be subject to field sobriety tests.

Had the emergency medical personnel not determined that Licensee was not medically cleared to refuse treatment and that he had to go to the hospital, Officer Hipple would have restrained Licensee at the scene and had him perform field sobriety tests, after which Officer Hipple would have presumably read him the DL-26 Form.  However, because Licensee had to go to the hospital, Officer Thiel followed him there and read him the DL-26 Form, which included: "*You are under*

10

*arrest for driving under the influence of alcohol or a controlled substance pursuant to Section 3731 of the Vehicle Code*[,]" after which Licensee insisted that Officer Thiel make phone calls to undo it, acknowledging that he knew he was under arrest. R.R. at 74a (emphasis added). Accordingly, because the totality of the circumstances indicate that Licensee was under arrest at the time of his chemical test refusal, the trial court properly concluded that he had been placed under arrest prior to refusing to submit to a chemical test.

Licensee next argues that Officer Thiel's extraterritorial conduct in Reading, Berks County, including his investigation and attempt to collect evidence from Licensee, was illegal under the ICA and the MPJA. Licensee contends that neither the ICA nor the MPJA authorized the extraterritorial conduct in another county that was a 30-minute drive away. Licensee asserts that Officer Thiel did not have jurisdiction to collect a blood sample and, as such, the request for a blood sample and alleged refusal were invalid.

In *Commonwealth v. Stair*, 699 A.2d 1250 (Pa. 1997) (equally divided court), the Pennsylvania Supreme Court was presented with the question of whether a Pennsylvania State Police Trooper (State Trooper) could lawfully administer the Implied Consent Law in another state to a licensee who had been involved in an automobile accident while operating a vehicle in Pennsylvania. The *Stair* Court affirmed the Pennsylvania Superior Court's order finding that a State Trooper had authority, pursuant to the Implied Consent Law, to advise the licensee of his rights under the Implied Consent Law and to request the licensee to submit to chemical testing of his blood while in another state.

11

The *Stair* Court explained:

Both the authority for the Pennsylvania police officer to request [chemical] tests, and the requirement for the Pennsylvania police officer to advise a [licensee] of his rights, are derived from the [] Implied Consent Law. According to the [] Implied Consent Law and our case law, all drivers in our Commonwealth are deemed to consent to [chemical] tests when a police officer has reasonable grounds to believe the [licensee] was operating his vehicle while under the influence of alcohol. *See . . . Dep[']t of Transp[., Bureau of Driver Licensing] v. Scott, . . .* 684 A.2d 539 ([Pa.] 1996); 75 Pa.C.S. § 1547(a).

Here, the record clearly shows that [the State] Trooper [] had reasonable grounds to believe [the licensee] was operating his vehicle while under the influence of alcohol, and that [the licensee] was subject to [S]ection 1547(a) [of the Vehicle Code] since he was driving in Pennsylvania and the accident occurred in Pennsylvania. The fact that [the licensee] was treated for his injuries in another jurisdiction immediately after an accident which occurred in Pennsylvania is irrelevant as to the issue of whether a Pennsylvania law enforcement officer retains [S]ection 1547(a) [of the Vehicle Code] authority to secure [chemical] test results from a driver suspected of driving under the influence of alcohol in Pennsylvania. If reasonable grounds exist for the Pennsylvania police officer to believe that a [licensee] was operating a vehicle while under the influence of alcohol in Pennsylvania, the requirements of [S]ection 1547(a) [of the Vehicle Code] are met, and the officer may proceed to secure [chemical] test results, provided, of course, that he also complies with the dictates of [S]ection 1547(b) [of the Vehicle Code]. Both [Section 1547(b) of the Vehicle Code] and *Scott*[] . . . require that a [licensee] be advised of his rights under the Pennsylvania Implied Consent Law, i.e., that his operating privilege will be suspended for a period of [12] months upon refusal to submit to chemical testing.

*Stair*, 699 A.2d at 1254 (footnotes omitted).

12

Similarly, here, the record clearly shows that Officer Hipple obtained her reasonable grounds to suspect that Licensee had committed a DUI offense in North Coventry Township, and that Licensee was thereby subject to Section 1547(a) of the Vehicle Code, since Licensee was driving in North Coventry Township, the accident occurred in North Coventry Township, and Officer Hipple conducted her investigation in North Coventry Township. Had her shift not ended, Officer Hipple would have read the Implied Consent Law warnings to Licensee at the hospital. Instead, Officer Thiel, who arrived at the scene in North Coventry Township, followed Licensee to the hospital and advised Licensee of his rights under the Implied Consent Law and requested Licensee to submit to chemical testing of his blood. The fact that Licensee was treated for his injuries in another jurisdiction immediately after the accident is irrelevant as to the issue of whether a North Coventry Township law enforcement officer retains authority pursuant to Section 1547(a) of the Vehicle Code to secure chemical test results from a driver suspected of driving under the influence of alcohol in North Coventry Township. Accordingly, Officer Thiel's extraterritorial conduct in Reading, Berks County, including his investigation and attempt to collect evidence from Licensee, was not illegal under the ICA and the MPJA.[6]

---

[6] Licensee asserts that *McKinley v. Department of Transportation, Bureau of Driver Licensing*, 838 A.2d 700, 706 (Pa. 2003), and *Martin v. Department of Transportation, Bureau of Driver Licensing*, 905 A.2d 438 (Pa. 2006), compel a different result because the *McKinley* Court and the *Martin* Court held that an officer outside his territorial jurisdiction did not have authority to stop and arrest a licensee outside the officer's territorial jurisdiction and, therefore, he was not lawfully acting as a police officer for purposes of the Implied Consent Law. However, in both cases, the officer made his initial stop and obtained his reasonable grounds to suspect that the licensee had committed a DUI offense outside of his jurisdiction. Here, Officer Hipple was within her territorial jurisdiction when she first made contact with Licensee and obtained her reasonable

For all of the above reasons, the trial court's order is affirmed.

_____
ANNE E. COVEY, Judge

---

grounds to believe that Licensee had committed a DUI offense. Accordingly, *McKinley* and *Martin* are inapposite.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert E. Markle,                                  :
              Appellant            :
                            :
           v.                            :
                            :
Commonwealth of Pennsylvania,        :
Department of Transportation,            :   No. 986 C.D. 2023
Bureau of Driver Licensing                :

## O R D E R

AND NOW, this 19th day of December, 2024, the Chester County Common Pleas Court's August 24, 2023 order is affirmed.

_____
ANNE E. COVEY, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert E. Markle,                    :
                        Appellant    :
                                     :
            v.                       :
                                     :
Commonwealth of Pennsylvania,        :
Department of Transportation,        : No. 986 C.D. 2023
Bureau of Driver Licensing           : Submitted: October 8, 2024


BEFORE:    HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE STACY WALLACE, Judge


CONCURRING OPINION
BY JUDGE WALLACE                          FILED:  December 19, 2024


       While I agree with the Majority's analysis and would also affirm the Chester
County Common Pleas Court's August 24, 2023 order, I write separately to note a
significant distinction between this matter and the case upon which the Majority
relies, *Commonwealth v. Stair*, 699 A.2d 1250 (Pa. 1997).

       In *Stair*, Pennsylvania State Police (PSP) troopers were investigating a
two-car accident that occurred in Pennsylvania at a location near the Maryland state
border. *Id.* at 1252. The appellant in *Stair*, who was one of the drivers, was
transported from the scene of the accident to a hospital in Maryland for medical
treatment. *Id.* After completing his investigation at the accident scene, a PSP trooper
proceeded to the hospital, in Maryland, and attempted to secure a blood alcohol test
under   what   is   commonly   known   as   the   Implied   Consent   Law   (ICL),

75 Pa.C.S. § 1547(a), from the appellant, whom the trooper suspected of driving under the influence of alcohol in Pennsylvania. *Id.* at 1253-54. The Pennsylvania Supreme Court considered whether the trooper could "administer the [ICL] . . . in another state to a driver who ha[d] been involved in an automobile accident while operating a vehicle in Pennsylvania." *Id.* at 1252. The Court ultimately concluded the trooper's conduct was permissible because it "was merely a fulfillment of an administrative act necessitated by the Pennsylvania [ICL]." *Id.* at 1256.

One of the appellant's arguments in *Stair* was that the trooper's actions outside Pennsylvania violated the Municipal Police Jurisdiction Act[1] (MPJA). *Stair*, 699 A.2d at 1254. The Court rejected this argument, determining the MPJA did not apply because PSP troopers are not municipal police officers.[2] *Id.* at 1255. Here, however, we are considering the conduct of a municipal police officer, not a PSP trooper.

Nevertheless, like the trooper in *Stair*, the municipal police officer in this matter left his primary jurisdiction to secure a blood alcohol test from a driver suspected of driving under the influence of alcohol after a crash in the municipal police officer's primary jurisdiction. Therefore, I would still apply the logic and reasoning of *Stair* and conclude the municipal police officer's conduct was not

---

[1]   42 Pa.C.S. §§ 8951-8955.

[2]   The MPJA defines a "municipal police officer" as "[a]ny natural person who is properly employed by a municipality, including a home rule municipality, as a regular full-time or part-time police officer." 42 Pa.C.S. § 8951.

illegal under the MPJA,[3] but was merely "an administrative act necessitated by the Pennsylvania [ICL]." *Stair*, 699 A.2d at 1256.

_____
STACY WALLACE, Judge

---

[3] Even if we did analyze this matter under the MPJA, I would conclude the police officer's conduct outside his primary jurisdiction was permissible as a hot and fresh pursuit under 42 Pa.C.S. § 8953(a)(2). In *Commonwealth v. Peters*, 965 A.2d 222, 225 (Pa. 2009), the Pennsylvania Supreme Court explained that "'hot pursuit' and 'fresh pursuit' require some sort of investigation and tracking of the perpetrator and that the pursuit be immediate, continuous and uninterrupted." Applying this definition, the Court determined police officers were in hot and fresh pursuit of a driver when the driver hit a telephone pole and fled the accident scene, police officers arrived after the driver fled the accident scene and began an investigation which continued for approximately one hour, and at the conclusion of the officers' investigation, they located the driver outside the jurisdiction of the accident. *Id.* at 224-25. Like in *Peters*, Robert E. Markle (Appellant) crashed his vehicle in the municipal police officer's primary jurisdiction, officers immediately began a continuous and uninterrupted investigation, and an officer pursued Appellant outside the officer's primary jurisdiction when Appellant was taken to receive necessary medical care.